IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PFLAUMER BROTHERS, INC., | CIVIL ACTION |
| Plaintiff, | |
| v. | No. 05-6709 |
| ROBERT A. THORDSEN, MONROE FLUID TECHNOLOGY, et. al., | |
| Defendants. | |

MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                                    **AUGUST 8, 2007**

      Presently before this Court are separate Motions for Summary Judgment filed by Defendant Monroe Fluid Technology, Inc. ("Monroe") and Defendant Robert A. Thordsen ("Thordsen"). Also before this Court is a Motion for Sanctions pursuant to Fed. R. Civ. P. 11 filed by Counterclaim Plaintiff Monroe, and another Motion for Summary Judgment for breach of contract filed by Counterclaim Plaintiff Thordsen. For the following reasons, Defendants' Motions are granted in part and denied in part, and Counterclaim Plaintiff Thordsen's Motion is denied. Judgment on Counterclaim Plaintiff Monroe's Motion for Sanctions is reserved pending a hearing before this Court.

**I.      BACKGROUND**

      Monroe is a New York corporation specializing in the manufacture of metalworking fluids, industrial cleaners, and rust preventatives. About half of Monroe's business consists of manufacturing its own product line. The remainder of its work involves custom blending fluids for customers. Thordsen is a Pennsylvania resident, who worked as a consultant for Pflaumer

Brothers, Inc. ("Pflaumer") from 1997 until November 30, 2005.  Pflaumer is a Pennsylvania corporation that manufactures a variety of chemicals including additives for metalworking fluids and lubricants.  Its product Tallicin 6590 is at the center of this action.

Thordsen developed a formula for a rust inhibitor in 1989.  He called the product IFI 6590, and that same year started the Interfluids company to sell it.  Interfluids had good success selling the formulation.  A year after starting Interfluids, the Quaker Chemical Company expressed interest in selling IFI 6590 under the Quaker brand name.  The parties eventually came to an agreement.  While the terms of that deal have not been presented to this Court, Thordsen testified that he received $100,000 and a new job, and Quaker began selling IFI 6590 under the brand name Quaker 6590.  Interfluids continued to exist subsequent to the deal.

Thordsen was then hired as a consultant by Pflaumer in 1997.  He was given the responsibility of increasing the company's sales of lubricants and formulated fluids.  Pflaumer expected him to generate new markets and develop new products for the Pflaumer brand name.  Thordsen signed a written employment contract on January 24, 1997, specifying his duties and compensation.  The terms of the contract required that Pflaumer pay Thordsen a $3,000 monthly fee, give him a 10% commission on new sales of Pflaumer products, and also pay him 10% on new and existing sales of Interfluids products.  Additionally, Thordsen signed an invention agreement giving Pflaumer the rights to future formulas he developed in the course of his duties, a non-compete agreement, and a non-disclosure agreement before commencing the consulting arrangement.

After he began working, Thordsen decided to provide his rust inhibitor to Pflaumer.  He mixed up the formula, and the company began selling it under the brand name Tallicin 6590.  It

is unclear whether the formula used in making Tallicin 6590 is the same formula used to produce IFI 6590. Thordsen first said that he mixed Tallicin 6590 from the same formula he invented, the formula for IFI 6590 and Quaker 6590. But later in his deposition, he said that Tallicin 6590 was made from an altered version of his base rust inhibitor IFI 6590. Thordsen said that he modified the formula to make use of the raw materials Pflaumer had available. A material dispute exists pertaining to the formula used to create Tallicin 6590. If the formula is the same as that used to make IFI 6590, then Pflaumer appears to have no rights to it. However, if the modification resulted in the creation of a new formula, then Pflaumer may well hold all the rights to it under the invention agreement signed by Thordsen.

Pflaumer believes that any dispute that may exist is irrelevant, as it claims that it owns the formula for IFI 6590. Pflaumer believes that it bought the formula for IFI 6590 when it bought Interfluids' building and land from Thordsen. On September 16, 2000, Interfluids' facility was sold to Tera LLC, a company owned by the president of Pflaumer, Harley McNair. This sale was subsequent to a lease agreement under which the parties had been operating. The written sale agreement has not been provided to this Court, but Mr. McNair has testified that its language includes only terms relating to the sale of the land and the building. He further testified that there is no written agreement for Pflaumer's or Tera's purchase of the IFI 6590 formula. Mr. McNair also believes that Pflaumer's purchase of the formula was accomplished through a combination of its employment contract with Pflaumer and the leasehold/sale agreement between Tera LLC and Thordsen. A material dispute exists pertaining to ownership of the rust inhibitor formulas.

On November 30, 2005, Pflaumer fired Thordsen. Broke and ill, Thordsen called his friend Alan Christodaro who works for Monroe looking for help. Pflaumer had not paid him all

of the commissions that he was owed under the terms of the agreement.  Mr. Christodaro is a senior vice-president at Monroe, and is responsible for its custom blending operations.  Thordsen initially sought a loan from Mr. Christodaro, but ultimately asked if Monroe could blend his rust inhibitor if he was able to locate buyers who wanted to purchase it directly from him.  Thordsen believed that he had a few prospective buyers, but recognized that he did not have the capability of supplying them.  Mr. Christodaro agreed to mix the rust inhibitor in the event that Thordsen secured buyers.  No business agreement existed between these men.  Mr. Christodaro has testified that he did this as a favor to his friend.

     Thordsen called Mr. Christodaro a few days later and provided three versions of the formula for the rust inhibitor he wanted Monroe to mix.  Mr. Christodaro testified that the formulas had the same chemical compositions as many other products already available in the market.  The day after he provided the formula, Thordsen called back to ask Mr. Christodaro to mix a sample of the first version, and send it to the Cincinnati Milacron company.  Before mixing a sample, Mr. Christodaro asked Thordsen if there were any encumbrances or non-compete agreements in regard to the formula that would prevent Monroe from custom blending the product.  Thordsen informed him that there would be no problems.  On or about December 5th, a one gallon sample of the rust inhibitor was mixed at Monroe and sent to the Cincinnati Milacron company.  The sample bore a label denoting the product as RP-201.  A few days later, Thordsen requested that a second sample gallon be sent to Cincinnati Milacron.  Mr. Christodaro obliged.  Ultimately, no sales of RP-201 were made, and Monroe did not mix anymore of the product beyond the two sample gallons.

     On December 6, 2005, Mr. Christodaro received a fax from the AWS company seeking a

price quote for Thordsen's rust inhibitor. The fax header incorrectly identified Mr. Christodaro as an employee of Pflaumer, and incorrectly identified the rust preventative as Tallicin 6590. Mr. Christodaro sent a return fax to AWS informing them that his company was called Monroe, and the product they were inquiring about was called RP-201. He also included a price quote of $673.75 per fifty-five gallon drum. No samples were ever sent to AWS. Mr. Christodaro had no further contact with that company.

On December 15, 2005, Pflaumer learned from one of its customers who dealt with AWS that Thordsen was soliciting AWS to buy a rust inhibitor similar to Tallicin 6590. Pflaumer contacted AWS to find out what was happening. Joana Thurow of AWS stated in an email on December 19, 2005, that Thordsen informed her company that the rust inhibitor they previously purchased from Pflaumer was now RP-201 and was made by Monroe. Pflaumer thereafter filed a Complaint on December 23, 2005, less than one month after Pflaumer fired Thordsen, alleging eight counts against Monroe and Thordsen.

Count I of the Complaint states that the Defendants entered into a scheme to defraud customers and steal proprietary information from Pflaumer in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. Count II states that Defendants violated the Lanham Act, 15 U.S.C. § 1125, by calling its product RP-201, which Pflaumer believes is similar enough to Tallicin 6590 to be confusing to consumers. In counts III, IV, V, and VI, it is alleged that these Defendants committed common law conversion, violated 12 Pa. C.S.A. § 5301 which is Pennsylvania's Uniform Trade Secrets Act, committed the tort of interference with property rights, and violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law,73 P.S. § 201-3. Counts VII and VIII, against Thordsen only, allege

breach of contract and breach of fiduciary duty.

After returning from his Christmas holiday and learning of the pending lawsuit, Mr. Christodaro called Cincinnati Milacron and stated that RP-201 could not be obtained through Monroe. He said that any inquiries for products like this should be directed to Pflaumer. A hearing was then held before this Court on January 4, 2006. Mr. Christodaro provided a declaration in which he stated among other things that Thordsen was not an employee of Monroe, only two sample gallons of the product were made, the trademark Tallicin was never used, he and Monroe had no intention of using the formula provided by Thordsen, and Monroe's employees were instructed not to speak with Thordsen. At the hearing, Pflaumer's testimony suggested that it had agreed to dismiss Monroe from the action.

In addition to summary judgment on all claims, Monroe has filed a motion for sanctions as it believes Pflaumer committed an abuse of process by maintaining the RICO claim against it despite knowing that no basis in fact exists in support of the charge. Thordsen has requested summary judgment on all claims alleged against him, and has filed a counterclaim against Pflaumer for breach of contract for failing to pay him the commissions he earned for which he also seeks summary judgment.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." See also Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court must ask "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. The non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence showing that there is a genuine factual dispute requiring a trial. Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). A genuine factual dispute exists when "a reasonable jury could return a verdict in favor of the non-moving party." Embrico v. U.S. Steel Corp., 404 F. Supp. 2d 802, 817 (E.D. Pa. 2005). When a party fails to establish an element of their case, summary judgment must be granted. Celotex, 477 U.S. at 322.

### III. DISCUSSION

#### A. Racketeer Influenced and Corrupt Organizations Act

Congress enacted the Racketeer Influenced and Corrupt Organizations Act ("RICO") in response to the unchecked growth of organized crime in the United States. Jimmy Gurule, Complex Criminal Litigation 57 (1996). The ultimate objective of RICO is to dismantle criminal organizations, and to that end the statute prohibits four distinct types of conduct. 18 U.S.C. § 1962(a)–(d) (2007). Plaintiff alleges that Monroe and Thordsen violated subsections (c) and (d) of the RICO statute.

##### 1. 18 U.S.C. § 1962(c)

Subsection (c) of the statute makes it "unlawful for any person employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." To prove a violation of 18 U.S.C. § 1962(c), Plaintiff must show that Monroe and Thordsen engaged in "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." Salinas v. United States, 522 U.S. 52, 62 (1997); Sedima, S.P.R.L, v. Imrex Co., Inc., 473 U.S. 479, 496 (1985). The case law shows that the "pattern" element is the most important part of the test. Failure to establish a RICO pattern is fatal to a plaintiff's case.

"Racketeering activity" is defined in the statute as "any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1343 (relating to wire fraud) . . . section 1952 (relating to [interstate transportation in aid of] racketeering)[.]" 18 U.S.C. § 1961(1)(B). Pflaumer alleges that Monroe and Thordsen were engaged in, and conspired to engage in, an enterprise which sought to defraud Pflaumer by stealing its trade secret formula and soliciting its prospective and current customers through the use of phone lines and interstate transit. Plaintiff presented evidence showing Thordsen conducted business with the German company AWS via telephone. (Pl's Opp'n Ex. 8, Thurow email.) Plaintiff has also shown that Monroe provided information to AWS via fax. (Pl's Opp'n Ex. 17, Christodaro fax.) Monroe sent two one-gallon samples of RP-201 to Cincinnati Milacron in Ohio from its facility in New York. (Def's Mot. Summ J. App. Ex. G, Christodaro Dep. at 6-7.) While it is unclear whether Defendants' action would constitute violations of 18 U.S.C. §§ 1343, 1952, this Court does not need to address the merits of those allegations. For the purposes of this Motion, this Court will assume arguendo that Defendants' actions constitute "racketeering activity" under the

definition provided in 18 U.S.C. § 1961(1).  Consequently, the only question addressed in this Memorandum is whether these actions are sufficient to establish a pattern under RICO.

The statute "requires at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering" to establish a "pattern of racketeering activity."  18 U.S.C. § 1961(5).  The Supreme Court promulgated guidelines for analyzing the RICO "pattern" element in H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 238 (1989).  In that case, the court said, "Section 1961(5) concerns only the minimum number of predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern beyond simply the number of predicate acts involved."  Id.  A pattern, according to the court, consists of a relationship between the predicates and the threat of continuing activity.  Id. at 239.  "It is this factor of *continuity plus relationship* which combines to produce a pattern."  Id.  Thus, Plaintiff must show more than the mere existence of two predicate acts to satisfy RICO's "pattern" element.

A plaintiff must show that the racketeering predicate acts are sufficiently related to each other to satisfy the relationship prong of the test.  See Gurule, Complex Criminal Litigation 83 (citing H.J. Inc., 492 U.S. at 240).  Relatedness means that the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  H.J. Inc., 492 U.S. at 240.  In this action, Monroe and Thordsen made phone calls, sent a fax, and shipped free samples for the purpose of soliciting sales of the rust preventative RP-201.  These acts are sufficiently related in that they have the same purpose and are not isolated events.  Plaintiff has satisfied the relatedness prong of the "pattern" element.

A plaintiff can establish continuity by showing "that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." Id. Continuity, as the H.J. Inc. court explained:

> is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. See Barticheck v. Fidelity Union Bank/First National State, 832 F.2d 36, 39 (3d Cir. 1987). It is, in either case, centrally a temporal concept, and particularly so in the RICO context, where what must be continuous, RICO's predicate acts or offenses, and the relationship these predicates must bear one to another, are distinct requirements.

Id. at 241-42. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." Id. No specific length of time automatically qualifies as a "substantial period of time" under the test, but "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement[.]" Id. The shortest period in which closed-ended continuity has been established is fourteen months. Swistock v. Jones, 884 F.2d 755, 759 (3d Cir. 1989). The events in this action occurred over a span of only 23 days. (Pl's Opp'n Ex. 3, Verified Complaint.) "[A] plaintiff [who] does not allege that the predicate acts lasted over a 'substantial period of time' . . . must allege a threat of continued criminal activity." Tabas v. Tabas, 47 F.3d 1280, 1303 (3d Cir. 1995).

Open-ended continuity can be demonstrated by showing "past conduct that by its nature projects into the future with a threat of repetition." Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 609 (3d Cir. 1991) (quoting H.J. Inc., 492 U.S. at 242). The determination of whether the predicate acts constitute a threat of continued racketeering activity depends on the facts of the case. Tabas v. Tabas, 47 F.3d 1280, 1296 (3d Cir. 1995). Pflaumer has not presented

any evidence showing that there was a continued threat of similar actions being committed by Monroe. Ironically, Pflaumer has presented evidence that shows that there is virtually no threat from Monroe. On January 3, 2006, Alan Christodaro made a declaration in which he stated: (a) that Monroe had no knowledge of the ownership of the formula Thordsen requested it custom blend for him, (b) that Monroe had not sold any RP-201, the rust preventative made from the formula provided by Thordsen, and (c) that Monroe had "no intention to produce or sell the formula that Mr. Thordsen requested [it] to custom blend." (Def's Mot. Summ. J. App. Ex. A.) Monroe agreed, on record before this Court, that it would neither manufacture any product from the formula provided by Thordsen, nor would it divulge the formula to anyone else. (Def's Mot. Summ. J. App. Ex. N at 6-10.) Thordsen testified that no one at Monroe ever asked him for customer lists of Pflaumer, nor did he provide any customer information to Monroe. (Def's Mot. Summ. J. Ex. C, Thordsen Dep. at 198-99.) Monroe instructed its employees not to speak with Thordsen or respond to his inquiries. (Def's Mot. Summ. J. Ex. A.) Alan Christodaro testified that he personally called Cincinnati Milacron and informed them the Monroe could not provide them with RP-201, and should they still desire the rust preventative they could procure it through Pflaumer. (Def's Mot. Summ. J. Ex. G, Christodaro Dep. at 38-39.) The evidence clearly shows that Monroe posed no continuing threat to Plaintiff's alleged trade secret or customer base, and Monroe must be granted summary judgment on count I of the Complaint in so far as it alleges a violation of 18 U.S.C. § 1962(c).

   Similarly, Pflaumer has not presented any evidence showing that Thordsen presents a continued threat to it. In the January 3, 2006, declaration of Alan Christodaro, paragraph 20 says "MFT has instructed its employees not to communicate with Mr. Thordsen, or to respond to any

inquiries or requests of Mr. Thordsen." (Def's Mot. Summ. J. Ex. A.)  Thordsen testified that Monroe "dropped me like a hot potato.  They've given instructions not to have anybody speak to me, talk to me or have any dealings with me." (Def's Mot. Summ. J. Ex. C, Thordsen Dep. at 199.)  The evidence shows that whatever relationship there had been between Thordsen and Monroe no longer exists.  Since Plaintiff has not presented evidence showing that Thordsen presents a continued threat, summary judgment must be granted in Thordsen's favor on count I of the Complaint in so far as it alleges a violation of 18 U.S.C. § 1962(c).

### 2. 18 U.S.C. § 1962(d)

Subsection (d) makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).  The Supreme Court has held that "a violation of section 1962(c) [i]s not a prerequisite to a violation of section 1962(d)." Smith v. Berg, 247 F.3d 532, 537 (3d Cir. 2001).  The defendant need only adopt the goal of furthering the criminal endeavor to be found guilty of RICO conspiracy. Salinas v. United States, 522 U.S. 52, 65-66 (1997).  "In accord with the general principles of criminal conspiracy law, a defendant may be held liable for conspiracy to violate section 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise." Smith, 247 F.3d at 538.  A "RICO conspiracy requires agreement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity." Banks v. Wolk, 918 F.2d 418, 421 (3d Cir. 1990) (internal quotations omitted).

Plaintiff has provided no evidence showing that Monroe agreed to commit acts that it knew were part of a pattern of racketeering activity.  Alan Christodaro testified that he was aware that Thordsen had fallen on bad times, and agreed to custom blend Thordsen's formula in the

12

event that Thordsen procured a buyer.  (Def's Mot. Summ. J. Ex. E, Christodaro Dep. at 87-88.)  Mr. Christodaro further testified that when he asked Thordsen whether the formula that he gave was subject to a non compete clause or any other legal encumbrances, Thordsen responded that it was not.  (Id. at 97-98.)  Mr. Christodaro stated in his declaration that he had no knowledge about the ownership of the custom blend formula provided by Thordsen.  (Def' Mot. Summ. J. Ex. A, Christodaro Decl.)  He also testified that the formula Thordsen provided was similar in form and function to other rust preventative formulas commonly made in the industry.  (Def's Mot. Summ. J. Ex. E, Christodaro Dep. at 90-91.)  Thordsen testified that Monroe did not ask for, nor did he provide, Pflaumer's customer lists.  (Def's Mot. Summ. J. Ex. C, Thordsen Dep. at 198-99.)

      Harley McNair, Pflaumer's president, testified that he believed that "Alan Christodaro, in [his] opinion, was subdued by Bob Thordsen[.]" (Def's Mot. Summ. J. Ex. D, McNair Dep. at 179.)  Mr. McNair testified that he believed that Mr. Christodaro's reason for custom blending the formula was "to help out Bob Thordsen."  (Id. at 180.)  The evidence does not show that Monroe knowingly agreed with Thordsen to steal trade secrets or customer lists from Pflaumer.  Therefore, summary judgment must be granted in favor of Monroe on count I of the Compliant in regard to the claim alleging a violation of 18 U.S.C. § 1962(d).  Since a conspiracy requires two parties and no facts show that there was another party, summary judgment must also be granted for Thordsen in regard to the 18 U.S.C. § 1962(d) claim.

      **B.**    **Trademark Infringement, the Lanham Act**

"The Lanham Act defines trademark infringement as use of a mark so similar to that of a prior user as to be likely to cause confusion, or to cause mistake, or to deceive." Freedom Card, Inc. v. JP Morgan, 432 F.3d 463, 469 (3d Cir. 2005) (internal quotations omitted).  "Thus, '[t]he

law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion.'" Id.  A plaintiff must show that the trademark (1) is valid and legally protectable, (2) is owned by the plaintiff, and (3) the defendant's use of the mark is likely to create confusion concerning the origin of the goods or services to prove a claim under 15 U.S.C. § 1125.  A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000).  "A likelihood of confusion exists when 'consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" Id. at 211.  "[W]hen the goods involved in a trademark infringement action directly compete with each other, a court 'need rarely look beyond the mark itself' to determine the likelihood of confusion."  Id. (citing Interspace Corp. v Lapp, 721 F.2d 460, 462 (3d Cir. 1983)).

Plaintiff does not oppose Defendant's Motion for Summary Judgment with respect to this particular claim.  Regardless, the evidence presented does not show that there is a likelihood of confusion among consumers.  Plaintiff's product is called Tallicin 6590.  (Compl. ¶ 43.)  The product that Monroe manufactured for Thordsen was labeled RP-201.  (Id.)  There is very little chance that a consumer viewing the RP-201 mark would probably assume that the product was associated with Pflaumer.  Since the Motion is uncontested, and Defendant's are entitled to judgment as a matter of law, summary judgment must be granted in their favor in regard to count II of the Complaint.

  **C.**  **Supplemental Jurisdiction Claims**

This Court had jurisdiction over this action because counts I and II of the Complaint alleged violations of federal law.  Counts III through VIII were brought before this Court under

the doctrine of supplemental jurisdiction. 28 U.S.C. § 1367. Additionally, Plaintiff has shown that diversity dose not exist in this action. (Compl. ¶ 2, 5, 6, 7.) The grant of summary judgment on the federal claims gives this Court a powerful reason to decline continued exercise of its supplemental jurisdiction power over the remaining state law claims. 28 U.S.C. § 1367(c)(3); see El v. Se. Pa. Transp. Auth., 418 F. Supp. 2d 659, 674 (E.D. Pa. 2005). This decision to decline continued exercise is a matter of discretion for this Court. Id. In the interest of justice, this Court will continue to exercise supplemental jurisdiction over Plaintiff's state law claims.

In regard to the Plaintiff's allegations of conversion, interference with property rights, and a violation of 12 Pa. C.S.A. § 5301, Pennsylvania's Uniform Trade Secrets Act, summary judgment must be denied. These claims all turn on the answer to the question of who owns the formula used to mix the rust preventative RP-201. As there is a disputed issue of fact in this regard, this Court cannot grant summary judgment.

Plaintiff also alleges that Defendants violated 73 P.S. § 201-3, Pennsylvania's Unfair Trade Practices and Consumer Protection Law. This act forbids a person from "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or qualities that they do not have[.]" 73 P.S. § 201-3(4)(v). An act or practice is deceptive or unfair if it has the capacity or tendency to deceive. Com. ex rel. Zimmerman v. Nickel, 26 Pa. D.& C.3d 115, 120 (Ct. Com. Pl. 1983). There is a material dispute concerning what Thordsen said to AWS about Pflaumer and Tallicin 6590. Therefore, summary judgment must be denied in regard to Thordsen. However, Pflaumer has presented no facts showing that Monroe represented that Pflaumer no longer existed or that Tallicin 6590 was no longer being manufactured under that name. Summary judgment must be granted in Monroe's favor on this claim.

Lastly, there are clearly material disputes about whether Pflaumer or Thordsen breached any of the agreements that they had signed. Thus, summary judgment must be denied on the counterclaim breach of contract action filed by Thordsen.

### D.       Motion for Sanctions

Monroe has filed a counterclaim seeking sanctions in which it claims that Pflaumer violated Fed. R. Civ. P. 11 and committed an abuse of process by bringing and continuing to pursue its RICO allegation against Monroe. This Court reserves its judgment on this matter pending a hearing, which shall be held on September 14, 2007, at 9:30 a.m. in courtroom 11B.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| PFLAUMER BROTHERS, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 05-6709 |
| | : | |
| ROBERT A. THORDSEN, MONROE | : | |
| FLUID TECHNOLOGIES, et. al., | : | |
| | : | |
| Defendants. | : | |

### ORDER

**AND NOW**, this   8th   day of August 2007, upon consideration of Defendants' Motions for Summary Judgment, Counterclaim Plaintiff Thordsen's Motion for Summary Judgment, Counterclaim Plaintiff Monroe's Motion for Sanctions, and all Responses and Reply thereto, it is hereby **ORDERED** that:

1. Defendant Monroe Fluid Technology's Motion for Summary Judgment (Doc. No. 49) is **GRANTED** with respect to count I, violation of 18 U.S.C. § 1962, count II, violation of 15 U.S.C. § 1125, and count VI, violation of 73 P.S. § 201-3. The Motion is **DENIED** with respect to counts III, IV, and V;

2. Defendant Robert A. Thordsen's Motion for Summary Judgment (Doc. No. 50) is **GRANTED** with respect to count I of the Complaint, 18 U.S.C. § 1962, and count II, 15 U.S.C. § 1125. The Motion is **DENIED** with respect to counts III, IV, V, VI, VII, and VIII;

3. Counterclaim Plaintiff Robert A. Thordsen's Motion for Partial Summary Judgment on his counterclaim (Doc. No. 51) is **DENIED**;

4. A **HEARING** shall be held to consider Counterclaim Plaintiff Monroe Fluid Technology's Motion for Sanctions (Doc. No. 49) on September 14, 2007, at 9:30 a.m. in courtroom 11B.  Judgment on the Motion for Sanctions is **RESERVED** pending the hearing.

BY THE COURT:

/s/ Robert F. Kelly
ROBERT F. KELLY
SENIOR JUDGE